

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| YVONNE GARREAUX, | * | CIV 07-3021 |
| | * | **2008 D.S.D. 7** |
| Plaintiff, | * | |
| | * | |
| | * | OPINION AND ORDER ON |
| -vs- | * | DEFENDANTS' MOTION TO |
| | * | DISMISS |
| UNITED STATES OF AMERICA[1], | * | |
| ALPHONSE JACKSON, Secretary of U.S. | * | |
| Department of Housing and Urban | * | |
| Development, his designees and assigns, and | * | |
| DIRK KEMPTHORNE, Secretary of U.S. | * | |
| Department of Interior, his designees and | * | |
| assigns, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**KORNMANN, U.S. DISTRICT JUDGE**

## INTRODUCTION

[¶1]     Plaintiff, Yvonne Garreaux ("Plaintiff"), instituted this suit pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680 and 1346(b), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  Plaintiff brings this action against the United States of America and its agents, Alphonse Jackson, Secretary of the Department of Housing and Urban Development ("HUD"), and Dirk Kempthorne, Secretary of the Department of Interior ("DOI"). Plaintiff seeks monetary damages in excess of $250,000 pursuant to the FTCA and declaratory and injunctive relief pursuant to the APA.  Plaintiff alleges two specific causes of action: (1) an FTCA claim, namely that HUD negligently created, supervised, approved and administered the plaintiff's Mutual Help Occupancy Agreement and that the Department of Interior's Bureau of

---

[1] A federal agency cannot be sued under the Federal Tort Claims Act.  The United States is the proper defendant.  28 U.S.C. § 2679, <u>F.D.I.C. v. Meyer</u>, 510 U.S. 471, 476-77, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994), and <u>Duncan v. Department of Labor</u>, 313 F.3d 445, 447 (8th Cir. 2002).

Indian Affairs ("BIA") negligently drafted, created, approved and administered the underlying lease agreement on land held in trust by the BIA and leased to the Cheyenne River Housing Authority ("CHRA"); (2) an APA claim, namely that both HUD and the BIA failed to enforce their standards and perform their duties; in other words, they have acted in a manner which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Defendant now moves to dismiss this action (Doc. 9) under Fed. R. Civ. P. 12(b)(1) for want of subject matter jurisdiction and under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## FACTUAL BACKGROUND

[¶2]    On September 21, 1977, the BIA approved a renewable twenty-five year renewable lease agreement between CHRA and certain Indian heirs of land held in trust for them by the United States. This parcel of land consisted of 2.5 acres in Dewey County, South Dakota. The lease terms provided that the premises were to be used to construct a dwelling for Mable Blackbird, one of the heirs, with the financial assistance of HUD, in accordance with the United States Housing Act of 1937. When Ms. Blackbird and her successors failed to make timely payments on the dwelling, the home was turned over to CHRA to be administered as a Mutual Help Home under the auspices of the MHHO Program administered by HUD. Under the MHHO Program, Indians who are eligible and interested in buying a family home enter into a contract, called a "Mutual Help and Occupancy Agreement" ("MHOA"), 42 U.S.C. § 1437bb(e), with the relevant Indian housing authority for that area, in this case CRHA.

[¶3]    In 1992, the plaintiff, an elderly Native American woman, allegedly entered into a MHOA with CHRA to purchase the dwelling. She allegedly took possession of the dwelling with the understanding that CHRA would make repairs to the dwelling and that if she complied with the terms of the MHOA, she would eventually be conveyed title to the dwelling. In March 2005, the necessary repairs were estimated at over $40,000, which was approximately equal to the appraised value of the home.

[¶4]    In October 2004, the plaintiff allegedly satisfied all the terms of the MHOA, with the exception of the final payment. Either the plaintiff or CHRA initiated contact to request a meeting to arrange conveyance of title. During the process of conveying title, the Superintendent

of the BIA contacted the plaintiff.  The Superintendent informed the plaintiff that because HUD no longer had an interest in the leased land, the lease was terminated and she had thirty days to move her house and leave the land.  Shortly thereafter, CHRA contacted the BIA to inform them that they still had a financial interest in the land because the final payment had not been made and because outstanding repairs to the dwelling had not been completed.  The BIA agreed that the lease could remain in effect until such time as CHRA ceased to maintain an interest or until an agreement was reached between the parties concerning the repairs.

[¶5]    Between March 2005 and May 2006, CHRA and the plaintiff attempted to resolve their differences.  CHRA offered to provide the plaintiff a replacement home, with the purchase price being offset by a credit for the value of her current home plus the amount of the outstanding repairs.  This offer was unacceptable to the plaintiff due to replacement home's location and due to the fact that the purchase price for the replacement home exceeded the credit being offered.  Unable to resolve their differences, on January 31, 2006,  the plaintiff filed an administrative compliant under the FTCA.  In her administrative complaint, the plaintiff alleged that HUD and the BIA negligently administered the MHOA and the lease agreement and were also negligent in their trust responsibility to an American Indian person.

[¶6]    Prior to the resolution of her administrative complaint, on July, 5, 2006, the plaintiff filed a complaint in the U.S. Court of Federal Claims ("COFC").  In that complaint, the plaintiff alleged that the government committed a breach of contract and a wrong under Article I of the 1868 Fort Laramie Treaty by the following acts: (1) breaching the MHOA; (2) failing to properly administer the MHOA; (3) failing to provide safe, sanitary and healthy living conditions as mandated by the Indian Housing Act; and (4) negligence in administration and breach of the MHOA.  On November 29, 2006, the BIA and HUD denied the plaintiff's administrative claims on the basis that the plaintiff chose to file a lawsuit in the COFC concerning the same matter.  28 U.S.C. § 2675(a).  On July 27, 2007, the COFC dismissed the plaintiff's complaint holding that (1) HUD did not have privity with the plaintiff; and (2) the plaintiff's breach of contract claims and negligence claims did not fall with the purview of the "bad men" provision of the Fort Laramie Treaty, so as to create subject matter jurisdiction.  Garreaux v. United States, 77 Fed.Cl.

726 (Fed.Cl. 2007). Finally, on May 22, 2007, plaintiff initiated this suit, claiming violations of the FTCA and the APA.

## DISCUSSION

### I.   STANDARD OF REVIEW

[¶7]   "Federal courts are not courts of general jurisdiction and have only the power that is authorized by Article III of the Constitution and statutes enacted by Congress pursuant thereto." Marine Equipment Management Co. v. United States, 4 F.3d 643, 646 (8th Cir. 1993) (*citing* Bender v. Williams-Port Area School Dist.*, 475 U.S. 534, 541, 106 S. Ct. 1326, 1331, 89 L. Ed. 2d 501, *reh'g denied* 476 U.S. 1132, 106 S. Ct. 2003, 90 L. Ed. 2d 682 (1986), (*citing in turn* Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803))). "The threshold inquiry in every federal case is whether the court has jurisdiction" and the Eighth Circuit has "admonished district judges to be attentive to a satisfaction of jurisdictional requirements in all cases." Rock Island Millwork Co. v. Hedges-Gough Lumber Co., 337 F.2d 24, 26-27 (8th Cir. 1964), and Sanders v. Clemco Industries, 823 F.2d 214, 216 (8th Cir. 1987).

[¶8]   A motion to dismiss for lack of subject matter jurisdiction challenges the court's power to hear the case. Mortensen v. First Savings and Loan Association, 549 F.2d 884, 891 (3rd Cir. 1977). Jurisdictional issues are for the court to decide and the court has broad power to decide its own right to hear a case. Osborn v. United States, 918 F.2d 724, 729 (8th Cir. 1990) (*quoting* Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir. 1981)). Because jurisdiction is a threshold question, judicial economy demands that the issue be decided at the onset. Osborne, at 729.

[¶9]   Where, as here, the defendants move for dismissal under Rule 12(b)(1), Fed.R.Civ.P., as well as on other grounds, "the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." 5 C. Wright and A. Miller, Federal Practice and Procedure, § 1350, p. 548 (1969). *cf.*, Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946) (motion to dismiss for failure to state a claim may be decided only after finding subject matter jurisdiction). "In order to properly dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the complaint must be successfully challenged on

4

its face or on the factual truthfulness of its averments." Titus v. Sullivan, 4 F.3d 590, 593 (8th Cir. 1993).

[¶10]   "The district court has the authority to consider matters outside the pleadings on a motion challenging subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." Drevlow v. Lutheran Church, Mo. Synod, 991 F.2d 468, 470 (8th Cir. 1993).  See also Osborn, 918 F.2d at 729, fn. 4 (citing Land v. Dollar, 330 U.S. 731, 735 & fn. 4, 67 S.Ct. 1009, 1011 & fn. 4, 91 L.Ed. 1209 (1947), and Satz v. ITT Fin. Corp., 619 F.2d 738, 742 (8th Cir. 1980)). Such consideration does not convert a motion to dismiss into a motion for summary judgment. Deuser v. Vecera, 139 F.3d 1190, 1191 fn. 3 (8th Cir. 1998), and Drevlow, 991 F.2d at 470. Plaintiff has the burden of establishing that jurisdiction exists.  It is not the responsibility of defendants to prove otherwise. Titus, 4 F.3d at 593 fn. 1.

[¶11]   The Eighth Circuit, in Osborn, delineated the standard of review for motions to dismiss under Fed. R. Civ. P. 12(b)(1):

> [H]ere the trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56.  Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction – its very power to hear the case – there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.  In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.  Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist.

918 F.2d at 730 (quoting Mortensen v. First Fed. Sav. & Loan Ass'n., 549 F.2d at 891). However, courts have also recognized that the jurisdictional issue and substantive issues can be so intertwined that a full trial on the merits may be necessary to resolve the issue. Id. (quoting Crawford v. United States, 796 F.2d 924, 928 (7th Cir. 1986)).  See also Whalen v. United States, 29 F. Supp. 2d 1093, 1095-96 (D.S.D. 1998).  The parties have submitted exhibits in support of and in resistance to the motion to dismiss and the court will consider such evidence as it relates to the jurisdictional challenge.

[¶12]   When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted the district count must accept the allegations of the complaint as true

and must construe them liberally in plaintiff's favor. Booker v. City of St. Louis, 309 F.3d 464, 467 (8th Cir. 2002), Duffy v. Landberg, 133 F.3d 1120, 1122 (8th Cir. 1998), Whisman el rel. Whisman v. Rinehart, 119 F.3d 1303, 1308 (8th Cir. 1997), and Hafley v. Lohman, 90 F.3d 264, 266 (8th Cir. 1996). Dismissal under Fed. R.12(b)(6) is appropriate only when it appears beyond doubt that plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997), and Dover Elevator Co. v. Arkansas State Univ., 64 F.3d 442, 445 (8th Cir. 1995). Moreover, all that is required of plaintiff's complaint is a "short and plain statement of the claim" stating why the plaintiff is entitled to relief. Fed. R. Civ. P. 8(a).

## II.    INDIAN HOUSING LEGISLATION

[¶13]   The federal government's involvement in Indian Housing began in the 1820s when it negotiated removal treaties with various Native American tribes. F. Cohen, Handbook of Federal Indian Law, § 22.05 (1982 ed.). See also Virginia Davis, A Discovery of Sorts:  Reexamining the Origins of the Federal Indian Housing Obligation, 18 Harv. Blackletter L.J. 211, 221-225 (2002). In these treaties, the federal government promised to compensate tribes for the loss of their homes and to assist them with new housing. Id. These promises continued throughout the 1800's and became more frequent in later treaties between the federal government and the tribes as the need to provide housing assistance for Native Americans was inextricably tied to assimilationist desires to attach Indians to permanent homes and to agriculture. Id. " This trend continued throughout the allotment and assimilation eras, as the Indian Department built increasing numbers of homes to help inculcate an American idea of private property." Id.

[¶14]   Not surprisingly, in 1928, the Meriam Report cited serious deficiencies in the government's efforts to provide suitable, safe, and sanitary housing for Native Americans. See Inst. for Gov't Research, The Problem of Indian Administration 8 (1928) (Lewis Meriam, Technical Director). In fact, the government's involvement in housing only exacerbated the intractable problems faced by Native Americans on the reservations. F. Cohen at § 22.05.

[¶15]   In 1934, the government passed the Indian Reorganization Act ("IRA"), 48 Stat. 984, chapter 576, 25 U.S.C. 461 et seq., to address some of the issue identified in the Meriam Report. Id. The IRA established a revolving fund that authorized the Secretary of the Interior to make

loans to tribes for the purposes of promoting economic development. 25 U.S.C. § 470. Also, beginning in 1936, some of the funds appropriated under the Emergency Relief Appropriation Acts, 49 Stat. 115, chapter 48, were dedicated to provide housing in Indian Country, resulting in the creation of a short-lived Indian Relief and Rehabilitation Program. F. Cohen at § 22.05.

[¶16]   In 1937, the United States Housing Act of 1937 ("Housing Act") was enacted to help Americans find decent, safe, and sanitary living conditions. Pub. L. No. 75-412, 50 Stat. 888 (1937), current version at 42 U.S.C. §§ 1437-1444. The Housing Act authorized government loans to public housing agencies for the development of or administration of public or low-rent housing. 42 U.S.C. § 1437g(c). In 1940, the Solicitor General determined that tribes could qualify as public housing agencies authorized to develop or administer low-rent housing. F. Cohen at § 22.05 (citing Op. Sol. Int., M-28316 (Mar. 18, 1936)).

[¶17]   Despite the Solicitor's opinion, programs for Native Americans were not created for another thirty years. Dewakuku v. Cuomo, 107 F.Supp.2d 1117, 1121 (D.Ariz. 2000) (Dewakuku I). See also F. Cohen at § 22.05. "It wasn't until 1962 that the Public Housing Administration, the predecessor to HUD, determined that the 1937 Housing Act even authorized low-rent housing programs on Indian lands." Id. Prevailing legal doctrines prior to the change held that tribes did not have the requisite power to enact housing ordinances and to create housing agencies, which are necessary to receive federal funding. Id. "This gap of nearly three decades is not surprising, however, given the federal policy regarding assimilation and the slow erosion of tribal lands." Id. But yet again, the stimulus for change was a devastating report on the state of housing in Indian Country. F. Cohen at § 22.05.

[¶18]   After the application of the Housing Act in Indian Country, the Mutual Help and Homeownership Program ("MHHO Program") was developed to assist low-income Indian families in purchasing their own homes. Dewakuku I, 107 F. Supp. at 1122. "Because Indian lands are held in trust by the government and alternative financing is often unavailable, this is, in essence, the only opportunity for Native Americans to participate in the American dream of home ownership." Id.

[¶19]   Under the MHHO Program, an Indian housing authority could apply to HUD for loans to enable the housing authority to develop public housing designed for sale to eligible tribal

members.  24 C.F.R. §§ 805.404(a), 805.415, 805.416, 805.421, 805.422 (1976).  Utilizing this program, housing authorities could sell public housing to low-income families under "such terms and conditions as [HUD] may determine by regulation."  42 U.S.C. § 1437c(h).   In practical terms, the MHHO Program was operated partly from HUD's regulations and partly from an Indian Housing Handbook.  *See* H.R.Rep. No. 100-604 (1988) (reprinted in 1988 U.S.C.C.A.N. 791, 793).

[¶20]   Unfortunately, this informal program proved ineffective because the housing needs of Native Americans in Indian Country were radically different than the needs of low-income Americans in urban areas.  *Id.* at 1122.  Despite the effort to include Native Americans in the Housing Act, an enormous demand for basic shelter persisted across Indian Country.  *Id.*  The next significant change in Indian housing legislation occurred with the enactment of the Indian Housing Act of 1988 ("Indian Housing Act").  42 U.S.C. §§ 1437aa-ff (1988) (repealed by Native American Housing Assistance and Self-Determination Act of 1996, Pub.L. No. 104-330, 110 Stat. 4016 (1996)).

[¶21]   The Indian Housing Act mandated that the Secretary of the Housing Department "provide lower income housing on Indian reservations and other Indian areas . . ."  42 U.S.C. § 1437aa(a) (1988).  The legislation, which incorporated many of the provisions of the original Housing Act, "was viewed as marking an important step towards enabling Native Americans to work with the Federal Government to obtain decent and affordable housing, to which all Americans are entitled."  Dewakuku I, 107 F. Supp. at 1123.  Another significant component of this new legislation was that it provided statutory authority for the MHHO Program to be carried out by HUD.  Dewakuku v. Martinez, 226 F.Supp.2d 1199, 1201 (D.Ariz. 2002) (Dewakuku III).  In response to its new statutory authority, HUD issued implementing regulations for the MHHO Program.  24 C.F.R. § 905 (1991).

[¶22]   Under the formalized MHHO Program, HUD entered into agreements called "Annual Contributions Contracts" ("ACC") with tribal housing authorities under which HUD agreed to provide a specified amount of money to fund projects undertaken by the housing authorities and preapproved by HUD.  24 C.F.R. §§ 805.102 (1979), 805.206.  After securing funding from HUD, the housing authority, in turn, would enter into MHOA's with eligible American Indian

families.  42 U.S.C. § 1437bb(e), and 24 C.F.R. § 805.406.  The family enters into what is, in essence, a lease-purchase agreement for a period up to twenty-five years.  42 U.S.C. § 1437bb(e)(2)(A)(i), and Dewakuku I, 107 F. Supp. at 1123.  The families were required to contribute land, labor, or materials to the building of their house, 24 C.F.R. § 805.408, and after occupying the house, each family was required to make monthly payments in an amount calibrated to family income, 24 C.F.R. § 805.416(a)(1)(ii).  *See also* 42 U.S.C. §§ 1437bb(e)(1), 1437bb(e)(2)(A)(i).  In addition, the families are responsible for all utility costs and maintenance. 42 U.S.C. § 1437bb(e)(3), and 24 C.F.R. § 805.418(a).  "The ownership contract differs from the lease agreement found in many public housing circumstances because a resident has an equitable interest in the property."  107 F. Supp. at 1123.  The families are required to contribute and invest in the ongoing development of the property.  42 U.S.C. §§ 1437bb(e)(2)(A)(i), 1437bb(e)(3).

[¶23]   In 1996, Congress repealed the Indian Housing Act and enacted the Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA"), 25 U.S.C. §§ 4101-4243.  The statute's statement of congressional findings declared, "federal Indian housing assistance was to be provided in a manner that recognizes the right of Indian self-determination and tribal self-governance and with the goals of economic self-sufficiency and self-determination for tribes and their members ."  Marceau v. Blackfeet Housing Authority, ___ F.3d ___, 2008 WL 726445 (9th Cir. 2008) (quotations omitted) (Marceau II), and 25 U.S.C. § 4101(6)- (7).  To accomplish this goal, the statute directs HUD to make annual block grants, in amounts determined by a formula, to a tribe or its designated housing entity (such as an Indian housing authority), to carry out activities related to the provision of affordable housing.  25 U.S.C. §§ 4111(a), 4152, and 24 C.F.R. §§ 1000.201, 1000.202, 1000.206, 1000.301-.340.

[¶24]   To be eligible for a HUD block grant, a tribe must submit to HUD an Indian housing plan that meets certain requirements and that is subject to HUD's approval.  25 U.S.C. § 4111(b), and 24 C.F.R. § 1000.201.  However, the housing plan is to be "locally driven."  24 C.F.R. § 1000.220.  "And HUD's statutorily prescribed role-in addition, of course, to providing the block grants themselves-is generally confined to a limited review of each Indian housing plan, and even then only to the extent that [HUD] considers review is necessary."  Marceau II, 2008

WL 726445  and 25 U.S.C. § 4113(a)(1).  "The grant, once made, is subject to tribal control; the recipient, rather than HUD, is responsible for operating the housing program, including the continued maintenance of housing." *Id.*, 25 U.S.C. § 4133, and 24 C.F.R. § 1000.56.  "HUD's responsibility consists primarily of oversight and audit, to ensure that federal funds are spent for the intended purpose." *Id.*, and 24 C.F.R. § 1000.520.

### III.   BIA LEASING AUTHORITY

[¶25]   In 1955, Congress passed the Indian Long-Term Leasing Act ("ITLA" or "Leasing Act"), permitting Indians to commit their lands to long-term leases, for "public, religious, educational, recreational, residential, or business purposes," subject to the approval of the Secretary of the Interior.  Brown v. United States, 42 Fed.Cl. 538, 543 (Fed.Cl. 1998), and 25 U.S.C. § 415.  With the passage of ITLA, Indians were permitted to realize the ultimate commercial potential from their land. *Id.*

[¶26]   The federal regulations governing leases of Indian land are found at 25 C.F.R. Part 162.  Indian land is defined in the regulations as "any tract in which an interest is owned by an individual Indian or tribe in trust or restricted status.  25 C.F.R. § 162.102.  Indian land owners may lease their land for up to 25 years,  but they can include provisions authorizing a renewal or an extension for one additional term for up to 25 years.  25 C.F.R. § 162.607 (a).  Leases may be negotiated by the tribe or individual Indian land owners concerned or with the assistance of the BIA.  25 C.F.R. § 162.107(a).

[¶27]   Approvals of leases are directly handled by the Bureau of Indian Affairs (BIA) by delegation from the Department of Interior.  Brown, 42 Fed.Cl. at 543.  Prior to approval of any lease or extension of an existing lease, the Secretary must be satisfied that adequate consideration has been given to environmental and land use factors.  25 U.S.C. § 415(a).  The BIA will attempt to ensure (through proper notice) that the use of the land is consistent with the landowners' wishes.  25 C.F.R. § 162.107(a).  Further, in reviewing a negotiated lease for approval, the BIA will defer to the landowners' determination that the lease is in their best interest, to the maximum extent possible.  25 C.F.R. § 162.107(a).

[¶28]   The BIA also has several responsibilities in administering and enforcing the leases.  These responsibilities are:

10

(a) We will ensure that tenants meet their payment obligations to Indian landowners, through the collection of rent on behalf of the landowners and the prompt initiation of appropriate collection and enforcement actions. We will also assist landowners in the enforcement of payment obligations that run directly to them, and in the exercise of any negotiated remedies that apply in addition to specific remedies made available to us under these or other regulations.

(b) We will ensure that tenants comply with the operating requirements in their leases, through appropriate inspections and enforcement actions as needed to protect the interests of the Indian landowners and respond to concerns expressed by them. We will take immediate action to recover possession from trespassers operating without a lease, and take other emergency action as needed to preserve the value of the land.

25 C.F.R. § 162.108 .

[¶29]   Any decisions taken by the BIA, with certain exceptions, under these regulations are appealable pursuant to 25 C.F.R. Part 2.  25 C.F.R. § 162.113.

## IV.   FTCA CLAIMS

[¶30]   It is well settled that "[t]he United States, as sovereign, is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." United States v. Mitchell, 445 U.S. 535, 538, 100 S. Ct. 1349, 1352, 63 L. Ed. 2d 607 (1980) (quoting United States v. Sherwood, 312 U.S. 584, 586, 61 S. Ct. 767, 769, 85 L. Ed. 1058 (1941)).  See also F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature.").  One such "consent to suit" is encompassed in the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-2680, which constitutes "a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." United States v. Orleans, 425 U.S. 807, 813, 96 S. Ct. 1971, 1975, 48 L. Ed. 2d 390 (1976).  Any waiver of sovereign immunity, including the FTCA, must be strictly construed and, to come within the ambit of a particular waiver, a claimant must fully adhere to all statutory procedures.  United States v. Mitchell, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980), and Block v. North Dakota, 461 U.S. 273, 287, 103 S.Ct. 1811, 1819, 75 L.Ed.2d 840

11

(1983).  Moreover, the plaintiff bears the burden of demonstrating that the government has unequivocally waived its sovereign immunity.  <u>Barnes v. United States</u>, 448 F.3d 1065, 1066 (8th Cir. 2006).

[¶31]   Plaintiff asserts essentially two FTCA claims: (1) that HUD negligently created, supervised, approved and administered the plaintiff's MHOA; and (2) that the BIA negligently drafted, created, approved and administered the underlying lease agreement on land held in trust by the BIA and leased to the CHRA.  The court will examine each of these claims in turn.

### A.   HUD'S CLAIMED NEGLIGENCE

[¶32]   Plaintiff's claims against HUD are premised on CHRA's alleged breach of its MHOA with the plaintiff, and on HUD's alleged breach of its ACC with CHRA.  Breaches of contract, in many instances, can also be treated as torts. "But . . . where the 'tort' complained of is based entirely upon breach by the government of a promise made by it in a contract, so that the claim is in substance a breach of contract claim, and only incidentally and conceptually also a tort claim, we do not think that the common law or local state law right to 'waive the breach and sue in tort' brings the case within the Federal Tort Claims Act.  <u>United States v. Smith</u>, 324 F.2d 622, 625 (5th Cir.1963 ) (<i>quoting</i> <u>Woodbury v. United States</u>, 313 F.2d 291, 295, (9th Cir.1963)).  <i>Accord</i> <u>Awad v. United States</u>, 301 F.3d 1367, 1372 (Fed. Cir. 2002).

[¶33]   Courts recognize that "[t]hough distinctions between contract and tort claims do not retain historic significance under modern judicial administration, they retain vitality in view of the jurisdictional provisions of laws consenting to actions against the government." <u>Murray v. United States</u>, 132 U.S. App. D.C. 91, 405 F.2d 1361, 1366-67 (D.C. Cir. 1968).  Under federal law, jurisdiction of the courts over contract claims against the government is different from jurisdiction over tort claims.  Contract claims are covered by the Tucker Act which confers upon the COFC jurisdiction over "any claim against the United States . . . founded . . . upon any express or implied contract with the United States . . . in cases not sounding in tort." 28 U.S.C. § 1491.  The district courts have concurrent jurisdiction of such cases under 28 U.S.C. § 1346(a)(2), but only when the claim does not exceed $10,000.  Jurisdiction over tort claims against the government is made exclusive to the district courts by 28 U.S.C. § 1346(b).

[¶34]   Plaintiff's claims exceed the $10,000 statutory limit, so the court lacks concurrent jurisdiction.  The court does have subject matter jurisdiction to adjudicate the plaintiff's tort claims, but only if they fall within the ambit of the FTCA.

[¶35]   Here, the plaintiff's grievances relate specifically to HUD's alleged failure to perform or to HUD's careless performance of a duty allegedly owed under the terms of these contracts.  *See* United States v. Neustadt, 366 U.S. 696 (1961) (careless performance of a duty allegedly owed sounds in torts).  These grievances have the potential to sound in both contract and tort.  Even though plaintiff has cast her allegations as torts, the defendant owed her no duty unless a contractual or an intended third party beneficiary relationship existed between the parties.  Absent these relationships, no duties were owed to the plaintiff.  First, with regard to the plaintiff's MHOA, the COFC found, and this court agrees, that the there was no privity of contract between HUD and the plaintiff.  *See* Garreaux, 77 Fed.Cl. at 731 (holding the fact that HUD administered the MHHO Program and supervised CHRA did not establish privity of contract between the government and tenant who entered into MHOA with CHRA under auspices of the MHHO Program).  Second, with respect to the ACC between HUD and CHRA, under similar circumstances, the U.S. Court of Appeals for the Federal Circuit found that a tenant is not an intended third party beneficiary under the ACC.  Dewakuku II, 271 F.3d at 1040, 1042 (ACC explicitly excludes claims against HUD by a third party as an intended beneficiary).  The court adopts the reasoning of this case.  Accordingly, I find the necessary predicate to all the plaintiff's tort claims, namely some type of contractual relationship, has not been met.

[¶36]   Additionally, the damages sought by the plaintiff also belie that this is a sustainable tort action.  Plaintiff's claim for damages caused by HUD's alleged breach are:  (1) money damages for loss of her interest in the home and property; (2) money damages for living in a substandard dwelling; (3) money damages for physical and emotional harm; and (4) specific performance, namely repair the home and convey title for the full estate or replace the home.  These damages are expectation damages and consequential damages relating to HUD's alleged breach of a contract.  *Accord* Claxton v. Small Business Admin. of the United States Government, 525 F.Supp. 777 (S.D.Ga.1981) (plaintiff's claim for damages caused by SBA's refusal to convey

13

title and for specific performance of contract does not fall within FTCA's jurisdictional grant). Consequently, plaintiff's alleged tort claims against HUD cannot be sustained.

[¶37]   In sum, the gravamen of the plaintiff's claims are that HUD did not perform at all or carelessly performed affirmative duties emanating solely from an alleged contractual relationship between them.  These claims are breach of contract claims and, at least in theory, tort claims.  However, without privity of contract, no contractual duty is owed to the plaintiff.  Absent a duty to the plaintiff, no tort claim can be sustained.  The question of duty is a question of law and there was no duty owed to the plaintiff.  These claims sound only in contract and thus are not actionable under the FTCA.  Also, the alleged breach of contract claims exceed the statutory maximum permitted for subject matter jurisdiction in district court.  Accordingly, this court finds that it does not have subject matter jurisdiction to adjudicate this controversy.  The defendants' motion to dismiss should be granted as to HUD.

## B.   BIA'S CLAIMED NEGLIGENCE

[¶38]   The plaintiff claims that the BIA negligently drafted, created, approved and administered the underlying lease agreement on land held in trust by the BIA and leased to the CHRA.  These claims suffer from some of the same infirmities found in the plaintiff's claims against HUD.  Again, there is no privity of contract between the BIA and the plaintiff.  The parties to the lease were the original Indian heirs of land held in trust by the government and CHRA.  The BIA was not a party to the lease.

[¶39]   While it is true that the BIA approved the lease and administered the lease agreement, these actions do not equate to making it a party to the lease or create any specific duties to the plaintiff.  The BIA is simply fulfilling its fiduciary obligations to the Indian landowner. Wilkinson V. United States, 440 F.3d 970, 975 (8th Cir. 2006).  The government owes no fiduciary duties to parties who are not landowners.  Nulankeyutmonen Nkihtaqmikon v. Impson, 503 F.3d 18, 31(1st Cir. 2007) (we can find no law in support of an enforceable fiduciary duty owed by the federal government to plaintiffs qua individuals who are not landowners).

[¶40]   The question of duty is a question of law and there was no duty owed to the plaintiff.  Also, the plaintiff cannot claim a specific trust relationship created by the Secretary's general obligation to consider their interests before approving a lease.  *See* Id. (citing Brown, 86 F.3d at

1562 ("[T]he statutory criteria that constrain the Secretary's exercise of his or her approval power are . . . in the nature of zoning, safety, or environmental concerns, which are the traditional general welfare concerns of government when acting in a non-fiduciary capacity.")). The government is simply not a trustee on behalf of lessees. *See* Burrell v. Acting Albuquerque Area Director, 35 IBLA 56, 58 (2000) (an oil and gas lease), Citation Oilfield Supply and Leasing, Ltd. v. Acting Billings Area Director, 27 IBLA 210, 223 (1995) (business lease), Great Western Casinos, Inc. v. Acting Pacific Regional Director, 36 IBLA 115, 122 (2001) (farming and grazing lease), Cooper v. Acting Southern Plains Regional Director, 41 IBIA 58, 60 (2006) (residential lease). Therefore, the plaintiff's FTCA claim cannot be sustained and the court does not possess subject matter jurisdiction. The defendants' motion to dismiss should be granted.

## V.     APA CLAIMS

[¶41]   Plaintiff alleges that she is entitled to relief under the APA, 5 U.S.C. §§ 702-706. The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Plaintiff's claimed statutory basis for a grant of subject matter jurisdiction is the Indian Housing Act, 42 U.S.C. §§ 1437aa-ff, and the regulations, 24 C.F.R. § 805 et seq., pertaining to the MHHO Program. While several cases have held that neither the Indian Housing Act nor NAHASDA provide an express or implied private right of action, Dewakuku v. Martinez, 271 F.3d 1031, 1040 (Fed.Cir. 2001)(Dewakuku II), and Marceau v. Blackfeet Housing Authority, 455 F.3d 974, 984 (9th Cir. 2006) (Marceau I), this is not necessarily a bar to the court's subject matter jurisdiction because the APA provides for judicial review of agency action, Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 61 124 S.Ct. 2373 (2004), and Central South Dakota Co-op. Grazing Dist. v. Secretary of U.S. Dept. of Agriculture, 266 F.3d 889, 894 (8th Cir. 2001).

[¶42]   When reviewing agency action, a court may only (1) "compel agency action unlawfully withheld or unreasonably delayed"; or (2) "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1)-(2)(A). But, the only agency action that can be compelled under the APA is action legally required. Norton, 542 U.S. at 62. Consequently, a

claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take. *Id.*

[¶43]   An agency decision is said to be arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

[¶44]   Further, where no other statute provides a private right of action, as is the case here, the "agency action" complained of must be " final agency action." Norton, 542 U.S. at 62, and § 704. Two conditions must be satisfied for an agency action to be final. First, the action must mark the consummation of the agency's decisionmaking process - it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177-78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

[¶45]   Accordingly, the first inquiry in this case is whether HUD's and BIA's oversight of CHRA's responsibilities constitute agency action. The defendant maintains that responsibility for the state of the plaintiff's dwelling rests with CHRA. While the defendants acknowledge that they control CHRA's financing and that they exercise some supervision over the contracts entered into by CHRA, this relationship does not translate into agency action. In other words, "[g]rants of federal funds generally do not create a partnership or joint venture with the recipient, nor do they serve to convert the acts of the recipient from private acts to governmental acts absent extensive, detailed, and virtually day-to-day supervision." Forsham v. Harris, 445 U.S. 169, 180, 100 S.Ct. 977 (1980) (*citing* United States v. Orleans, 425 U.S. 807, 818, 96 S.Ct. 1971, 1977, 48 L.Ed.2d 390 (1976)). In their view, CHRA is a private contractor and the APA does not permit suits between private parties. Solien v. Miscellaneous Drivers and Helpers Union, 440 F.2d 124 (8th Cir. 1971). Also, the defendants rely upon the fact that they were strangers to this contract (the MHOA), i.e. there was no privity of contract between the

16

defendants and the plaintiff. *See* Garreaux, 77 Fed.Cl. at 731 (holding the fact that HUD administered the MHHO Program and supervised CHRA did not establish privity of contract between the government and tenant who entered into MHOA with CHRA under auspices of the MHHO Program). Concerning the issue of the BIA being a party to the land lease and exercising supervision over it, the defendants contend that this claim was not presented to the BIA and therefore, the claim has not been exhausted and cannot be reviewed by the court. *See* Crow Creek Sioux Tribe v. Bureau of Indian Affairs, 463 F.Supp.2d 964 (D.S.D. 2006). Further, the defendants' contend the Indian Housing Act's maintenance responsibilities for MHOA homes are vague. *See* 24 C.F.R. § 905.345. In fact, the regulations explicitly put the maintenance burden on the homeowner. *See* 24 C.F.R. § 905.345(d).

[¶46]   Alternatively, the plaintiff argues that HUD's control over CHRA is near total and that CHRA is not a wholly independent entity. In fact, according to the plaintiff, it is a creature of HUD and, the acts of CHRA are the acts of HUD. Further, the plaintiff claims that HUD failed in its oversight responsibility in two respects: (1) HUD did not properly ensure the plaintiff's dwelling was "decent, safe, and sanitary;" (2) HUD did not exercise proper oversight when it permitted the plaintiff to enter into MHOA with a defective land lease. Plaintiff finds support for her argument in Dewakuku III where the court held that HUD violated the APA when it failed to properly supervise the local housing authority and when it failed to provide a tribe member with a dwelling which was decent, safe, and sanitary. *See* 226 F.Supp.2d 1199. With respect to the BIA, the plaintiff contends that the BIA is a party to the land lease and has supervisory powers over the lease agreement. With the BIA's relationship to the lease, the plaintiff claims they should have never approved a lease that does not enable the plaintiff to take full title.

[¶47]   The court finds merit in the defendants arguments. First, as previously mentioned, the defendants' duties to the plaintiff with respect to the MHOA or the land lease and the acts of CHRA were private acts and not acts of the government. There is plenary control of neither the money nor the property. *Id.* Also, the evolution of Indian Housing legislation is toward increased Indian self-determination and greater tribal self-governance. The statute authorizing the Indian Housing Act stated the objective of the legislation was "to vest in local public housing agencies the maximum amount of responsibility in the administration of their housing programs." 42

17

U.S.C. § 1437.  NAHASDA's statement of congressional findings recognized, federal Indian housing assistance was to be provided "in a manner that recognizes the right of Indian self-determination and tribal self-governance" and with the "goals of economic self-sufficiency and self-determination for tribes and their members ." 25 U.S.C. § 4101(6)- (7).  To adopt the plaintiff's arguments would require the federal government to micro manage the affairs of housing authorities and completely destroy the authority of the local housing authority.

[¶48]  Second, Dewakuku III is distinguishable from the instant case because Dewakuku III was primarily concerned HUD agency action pertaining to initial construction of the MHOA house.  HUD's role in the initial construction of public housing can be pervasive.  This case is not about the initial construction of the home or a de facto warranty of habitability.  It is about allegations of promised repairs to an existing home and a defective land lease.  The regulations make clear that the maintenance obligations are the responsibility of the owner, not HUD.  See Marceau II, 2008 WL 726445 ("Ultimately, no statute ever required tribes to form housing authorities.  No statute obliged Indian housing authorities, once formed, to seek federal funds.  No statute committed the United States itself to construct houses on Indian lands or to manage or repair them.  Indeed, the relevant regulations expressly imposed inspection duties on Indian housing authorities, independently of HUD, including any enforcement of warranties.  No statute has imposed duties on the government to manage or maintain the property. . . ").  Further, if there was a promise to repair the home then this is a contractual obligation that CHRA entered into, not HUD.  It was, if anything, a contractual obligation between two private parties.

[¶49]  Finally, the plaintiff's APA claim falls short because a claim under the APA requires, among other things, that the claimant seek "relief other than money damages."  5 U.S.C. § 702, Bowen v. Massachusetts, 487 U.S. 879, 895-902 (1988) (analyzing the meaning of "money damages" in 5 U.S.C. § 702).  Examination of the relief that the plaintiff seeks does not stop at her allegations.  Marceau I, 455 F.3d at 985.  Instead, "the substance of the pleadings must prevail over their form."  Id. (citing Tucson Airport Auth. v. Gen. Dynamics Corp., 136 F.3d 641, 645 (9th Cir.1998) (examining plaintiff's APA claims and concluding that the "claims are not 'for money damages'").  The court must "discern the nature of the relief being sought and focus on the type of relief that will result from the action."  Id.  As previously discussed, the

18

essence of the relief sought by the plaintiff is money damages.  Accordingly, for all the reasons stated above the court lacks subject matter jurisdiction and the defendants' motion to dismiss should be granted.

## ORDER

[¶50]  Now, therefore,

[¶51]  IT IS ORDERED, as follows:

    (1)  The motion of defendants to dismiss (Doc. 9) is granted.

    (2)  The motion of defendants for extension of time to file an answer (Doc. 4) is denied as moot.

    (3)  The motion of defendants for leave to file excess pages (Doc. 6) is granted.

[¶52]  Dated this 29th day of March, 2008.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____ DEPUTY

    (SEAL)

19